Evan Krinick (EK 4271)
Barry I. Levy (BL 2190)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Defendant and Counterclaim-Plaintiff*
*State Farm Mutual Automobile Insurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

HMP ORTHOPAEDICS, P.C. and RICHARD
PEARL, M.D.,

        Plaintiffs,

              Docket No. 13-cv-2786 (RS)(FM)

    -against-

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

        Defendant.
-----------------------------------------------------------------X

## ANSWER WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

   Defendant State Farm Mutual Automobile Insurance Company ("Defendant" or "State Farm"), by its attorneys, Rivkin Radler LLP, hereby answers the allegations in the Complaint of Plaintiffs HMP Orthopaedics, P.C. ("HMP") and Richard Pearl, M.D. ("Pearl") (collectively "Plaintiffs") in accordance with the numbered paragraphs therein as follows:

   1.  Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "1" of the Complaint, except admits that HMP submitted no-fault insurance claims to Defendant.

   2.  Defendant denies the allegations set forth in paragraph "2" of the Complaint, except admits that it has denied certain of HMP's no-fault claims.

3.      Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "3" of the Complaint, except admits that Plaintiffs have commenced the present action, and respectfully submits that the Complaint in this action speaks for itself.

4.      Defendant denies the allegations set forth in paragraph "4" of the Complaint, except admits that Plaintiffs have commenced the present action, and respectfully submits that the Complaint in this action speaks for itself.

5.      Defendant admits the allegations set forth in paragraph "5" of the Complaint, except denies that HMP is a properly-licensed New York medical professional corporation and denies knowledge and information sufficient to form a belief as to whether Pearl actually is a principal of HMP.

6.      Defendant admits the allegations set forth in paragraph "6" of the Complaint.

7.      Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "7" of the Complaint.

8.      The allegations in paragraph "8" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "8" of the Complaint is deemed to be required, Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "8" of the Complaint.

9.      Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "9" of the Complaint.

10.      Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "10" of the Complaint, except admits that

Pearl currently is licensed to practice medicine in New York and denies that HMP is a properly-licensed New York medical professional corporation.

11.     Defendant admits the allegations set forth in paragraph "11" of the Complaint.

12.     Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "12" of the Complaint.

13.     Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "13" of the Complaint, except admits that HMP submitted no-fault insurance claims to Defendant.

14.     The allegations in paragraph "14" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "14" of the Complaint is deemed to be required, Defendant submits that the Insurance Law speaks for itself, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "14" of the Complaint.

15.     The allegations in paragraph "15" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "15" of the Complaint is deemed to be required, Defendant submits that the pertinent regulations speak for themselves, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "15" of the Complaint.

16.     The allegations in paragraph "16" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "16" of the Complaint is deemed to be required, Defendant submits that the pertinent regulations speak for themselves, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "16" of the Complaint.

17.     The allegations in paragraph "17" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "17" of the Complaint is deemed to be required, Defendant submits that the pertinent regulations speak for themselves, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "17" of the Complaint.

18.     The allegations in paragraph "18" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "18" of the Complaint is deemed to be required, Defendant submits that the pertinent regulations speak for themselves, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "18" of the Complaint.

19.     The allegations in paragraph "19" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "19" of the Complaint is deemed to be required, Defendant submits that the pertinent regulations speak for themselves, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "19" of the Complaint.

20.     The allegations in paragraph "20" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "20" of the Complaint is deemed to be required, Defendant submits that the pertinent regulations speak for themselves, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "20" of the Complaint.

21.     The allegations in paragraph "21" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "21" of the Complaint is deemed to be required, Defendant submits that the pertinent regulations speak for

themselves, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "21" of the Complaint.

22.    The allegations in paragraph "22" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "22" of the Complaint is deemed to be required, Defendant submits that the pertinent regulations and opinions speak for themselves, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "22" of the Complaint.

23.    The allegations in paragraph "23" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "23" of the Complaint is deemed to be required, Defendant submits that the pertinent regulations speak for themselves, and otherwise denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "23" of the Complaint.

24.    Defendant admits the allegations set forth in paragraph "24" of the Complaint.

25.    Defendant admits the allegations set forth in paragraph "25" of the Complaint.

26.    Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "26" of the Complaint.

27.    Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "27" of the Complaint.

28.    Defendant denies the allegations set forth in paragraph "28" of the Complaint.

29.    Defendant denies the allegations set forth in paragraph "29" of the Complaint.

30.    Defendant denies the allegations set forth in paragraph "30" of the Complaint.

31.     Defendant denies the allegations set forth in paragraph "31" of the Complaint, except admits that it requested additional verification of the Plaintiffs' claims.

32.     Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "32" of the Complaint, except admits that an insurer may deny a healthcare provider's no-fault claim if the healthcare provider fails or refuses to provide additional verification of the claim.

33.     Defendant denies the allegations set forth in paragraph "33" of the Complaint, except admits that it conducted an examination under oath of Pearl in February 2012.

34.     The allegations in paragraph "34" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "34" of the Complaint is deemed to be required, Defendant denies the allegations set forth in paragraph "34" of the Complaint.

35.     Defendant admits the allegations set forth in paragraph "35" of the Complaint, except denies that it had any obligation to pay the pertinent claims or that its non-payment of any portion of the pertinent claims constituted a "failure".

36.     Defendant incorporates by reference its responses to paragraphs "1" – "35" above, as if more fully set forth herein.

37.     The allegations in paragraph "37" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "37" of the Complaint is deemed to be required, Defendant submits that the Insurance Law speaks for itself, and otherwise denies the allegations set forth in paragraph "37" of the Complaint.

38.     Defendant denies the allegations set forth in paragraph "38" of the Complaint, except admits that is has not paid the claims in full.

39.     The allegations in paragraph "39" of the Complaint state a legal conclusion to which no response is required. To the extent that any response to paragraph "39" of the Complaint is deemed to be required, Defendant submits that the Insurance Law speaks for itself, and otherwise denies the allegations set forth in paragraph "39" of the Complaint.

40.     Defendant denies the allegations set forth in paragraph "40" of the Complaint.

41.     Defendant denies the allegations set forth in paragraph "41" of the Complaint.

42.     Defendant denies the allegations set forth in paragraph "42" of the Complaint.

43.     Defendant incorporates by reference its responses to paragraphs "1" – "42" above, as if more fully set forth herein.

44.     Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "44" of the Complaint, except admits that its no-fault insurance policies provide for payment of reasonable and necessary medical expenses arising out of covered automobile accidents.

45.     Defendant denies the allegations set forth in paragraph "45" of the Complaint.

46.     Defendant denies the allegations set forth in paragraph "46" of the Complaint.

47.     Defendant denies the allegations set forth in paragraph "47" of the Complaint.

48.     Defendant denies the allegations set forth in paragraph "48" of the Complaint, except admits that is has not paid the claims in full.

49.     Defendant denies the allegations set forth in paragraph "49" of the Complaint.

50.     Defendant incorporates by reference its responses to paragraphs "1" – "49" above, as if more fully set forth herein.

51.     Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "51" of the Complaint.

52.     Defendant denies the allegations set forth in paragraph "52" of the Complaint.

53.     Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "53" of the Complaint, except denies that any services Plaintiffs purported to provide were reimburseable under Defendant's no-fault insurance policies.

54.     Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "54" of the Complaint.

55.     Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "55" of the Complaint.

56.     Defendant denies the allegations set forth in paragraph "56" of the Complaint, except admits that is has not paid the claims in full.

57.     Defendant denies the allegations set forth in paragraph "57" of the Complaint.

### FIRST AFFIRMATIVE DEFENSE

58.     The Complaint fails to state a cause of action upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

59.     Plaintiffs' claims are barred by their failure to mitigate their damages.

### THIRD AFFIRMATIVE DEFENSE

60.     Plaintiffs have engaged in fraudulent conduct and have made material misrepresentations or omissions to Defendant and, accordingly, are not entitled to recovery of any damages or a declaratory judgment.

### FOURTH AFFIRMATIVE DEFENSE

61.     Plaintiffs' claims are barred by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

62.     Plaintiffs lack standing to bring the claims asserted.

## SIXTH AFFIRMATIVE DEFENSE

63.     Plaintiffs are not intended third party beneficiaries to the contracts between Defendant and its insureds.

## SEVENTH AFFIRMATIVE DEFENSE

64.     Plaintiffs' claims are barred because they arise out of or are a product of Defendants' own illegal acts.

## EIGHTH AFFIRMATIVE DEFENSE

65.     To the extent a contract is found to exist between the parties, and without admission of same, Plaintiffs' claims are barred by their breach of the covenant of good faith and fair dealing.

## NINTH AFFIRMATIVE DEFENSE

66.     Plaintiffs' claims are barred as the result of their breach of a fiduciary duty.

## TENTH AFFIRMATIVE DEFENSE

67.     Plaintiffs are equitably estopped from recovering on their claims.

## ELEVENTH AFFIRMATIVE DEFENSE

68.     Plaintiffs' claims are barred by their acts of self-dealing.

## TWELFTH AFFIRMATIVE DEFENSE

69.     Defendant is entitled to a setoff that exceeds the value, if any, of Plaintiffs' claims.

## THIRTEENTH AFFIRMATIVE DEFENSE

70.     Defendant performed each and every duty owed to Plaintiffs.

## FOURTEENTH AFFIRMATIVE DEFENSE

71.     At all times relevant hereto, Defendant acted in a reasonable and proper manner.

## FIFTEENTH AFFIRMATIVE DEFENSE

72.     Defendant at all times relevant hereto complied with all federal, state and local statutes, regulations and/or ordinances in effect.

## SIXTEENTH AFFIRMATIVE DEFENSE

73.     Plaintiffs' injuries, if any, were caused in whole or in part by the culpable conduct and fault attributable to them and the amount of damages otherwise recoverable by Plaintiffs should be extinguished or reduced in the proportion that the culpable conduct attributable to the Plaintiffs bears to the culpable conduct that caused the damages.

## SEVENTEENTH AFFIRMATIVE DEFENSE

74.     Plaintiffs engaged in unlawful fee-splitting with unlicensed individuals and entities and, therefore, are not entitled to bill for or to recover no-fault benefits.

## EIGHTEENTH AFFIRMATIVE DEFENSE

75.     Plaintiffs are not properly licensed and, therefore, are not entitled to bill for or to recover no-fault benefits.

## NINETEENTH AFFIRMATIVE DEFENSE

76.     Plaintiffs did not take valid assignments of benefits from Defendant's insureds and, therefore, are not entitled to bill for or to recover no-fault benefits from Defendant.

## TWENTIETH AFFIRMATIVE DEFENSE

77.     Plaintiffs lack the standing to maintain this action.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

78.     Plaintiffs paid unlawful kickbacks in exchange for patient referrals, and therefore are not entitled to bill for or to recover no-fault benefits.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

79.     Plaintiffs billed for services provided by independent contractors, rather than by Plaintiffs or their employees, and therefore Plaintiffs are not entitled to bill for or to recover no-fault benefits in connection with such services.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

80.     The Defendant hereby reserves the right to interpose such other defenses as discovery may disclose.

## COUNTERCLAIMS

Counterclaim-Plaintiff State Farm Mutual Automobile Insurance Company (the "Counterclaim-Plaintiff" or "State Farm"), as and for its Counterclaims against Counterclaim-Defendants HMP Orthopaedics, P.C. ("HMP") and Richard Pearl, M.D. ("Pearl") (collectively the "Counterclaim-Defendants"), hereby alleges, upon information and belief, as follows:

## NATURE OF THE COUNTERCLAIMS

81.     These Counterclaims seek to recover more than $104,000.00 that the Counterclaim-Defendants have stolen from State Farm by submitting, and causing to be submitted, dozens of fraudulent no-fault insurance charges for healthcare services (the "Fraudulent Services") that the Counterclaim-Defendants knew to be unreimburseable.

82.     In addition, State Farm seeks a declaration that it is not legally obligated to pay reimbursement of more than $179,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the Counterclaim-Defendants because:

      (i)     the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Counterclaim-Defendants and others; and

      (ii)    the Counterclaim-Defendants unlawfully split fees with unlicensed individuals and – therefore – were ineligible to bill for or to collect no-fault benefits.

83.     As discussed herein, the Counterclaim-Defendants at all relevant times have known that:

      (i)     the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Counterclaim-Defendants and others; and

      (ii)    the Counterclaim-Defendants unlawfully split fees with unlicensed individuals and – therefore – were ineligible to bill for or to collect no-fault benefits.

84.     As such, the Counterclaim-Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they have billed to State Farm. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that the Counterclaim-Defendants have submitted, or caused to be submitted, to State Farm. The Counterclaim-Defendants' fraudulent scheme began as early as 2008 and has continued uninterrupted since that time. As a result of the Counterclaim-Defendants' scheme, State Farm has incurred damages of more than $104,000.00.

## THE PARTIES

### I.    Counterclaim-Plaintiff

85.     Counterclaim-Plaintiff State Farm Mutual Automobile Insurance Company is an Illinois corporation with its principal place of business in Bloomington, Illinois. State Farm is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Counterclaim-Defendants

86.     Counterclaim-Defendant Richard Pearl, M.D. resides in and is a citizen of New York. Pearl was licensed to practice medicine in New York on March 24, 1978, purports to be

the owner and sole shareholder of HMP, and purported to perform many of the Fraudulent Services.

87.     In September 2000, Pearl was charged with 24 specifications of professional misconduct by the New York State Department of Health Board for Professional Medical Conduct (the "State Board"), including practicing with gross negligence, practicing fraudulently, failing to maintain records that accurately reflected the treatment and care of his patients, and engaging in practices that demonstrated a moral unfitness to practice medicine.

88.     Thereafter, in an April 4, 2001 Determination and Order, the State Board found Pearl guilty of practicing with gross negligence, practicing fraudulently, failing to maintain records that accurately reflected the treatment and care of his patients, and engaging in practices that demonstrated a moral unfitness to practice medicine. A copy of the April 4, 2001 Determination and Order is annexed hereto as Exhibit "2". Pursuant to the April 4, 2001 Determination and Order, the State Board suspended Pearl's medical license for three years, stayed the suspension for the second and third years, and fined Pearl $50,000.00. See Exhibit "2".

89.     Following an appeal, the New York State Department of Health Administrative Review Board for Professional Medical Conduct (the "Administrative Review Board") issued a July 3, 2001 Determination and Order in which the Administrative Review Board affirmed the State Board's decision to the extent that it found Pearl guilty of professional misconduct, but overturned the State Board's decision regarding the appropriate disciplinary penalty. A copy of the July 3, 2001 Determination and Order is annexed hereto as Exhibit "3". Specifically, instead of a three-year suspension and a $50,000.00 fine, the Administrative Review Board revoked Pearl's medical license altogether. See Exhibit "3".

90.     Pearl then commenced a proceeding pursuant to N.Y. C.P.L.R. Article 78, in an attempt to reverse the Administrative Review Board's decision to revoke his medical license. However, in Pearl v. N.Y. State Bd. for Prof'l Med. Conduct, 295 A.D.2d 764 (3d Dep't 2002), the Appellate Division confirmed the Administrative Review Board's decision and dismissed Pearl's petition, holding – among other things – that "the findings of fraud by petitioner are alone sufficient to merit the penalty imposed."

91.     In September 2004, Pearl applied to the New York State Education Department (the "Education Department") for the restoration of his medical license. Ultimately, in late October 2008, the Education Department restored Pearl's medical license after determining, inter alia, that he had demonstrated remorse for his conduct.

92.     Upon information and belief, however, despite the restoration of Pearl's medical license, the publicity attendant to his professional discipline made it virtually impossible for him to obtain patient referrals from legitimate sources.

93.     Counterclaim-Defendant HMP Orthopaedics, P.C. is a fraudulently-licensed New York medical professional corporation with its principal place of business in New York. HMP was incorporated in New York on December 1, 2008, purportedly is owned by Pearl, and serves as the vehicle through which the Counterclaim-Defendants submit fraudulent billing for the Fraudulent Services to insurers, including State Farm.

## **JURISDICTION**

94.     This Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367(a), inasmuch as they arise out of the same transactions and occurrences as the claims in the Counterclaim-Defendants' Complaint, so as to form part of the same case or controversy within the meaning of Article III of the United States Constitution. This Court also has jurisdiction over

these Counterclaims under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.    **An Overview of the No-Fault Laws and Licensing Statutes**

95.    State Farm underwrites automobile insurance in New York.

96.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to insureds.

97.    No-Fault Benefits include up to $50,000.00 per insured for necessary expenses that are incurred for healthcare goods and services, including physician services.

98.    An insured can assign his or her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a properly-licensed health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a properly-licensed healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

99.     Pursuant to the No-Fault Laws, healthcare providers are not eligible to bill for or collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

100.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

(Emphasis added).

101.     New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals. See N.Y. Education Law § 6530; 8 N.Y.C.R.R. § 29.1.

102.     Except in limited circumstances that are not applicable in the present case, New York law prohibits licensed healthcare providers from splitting fees for professional services with third parties, regardless of whether the third parties themselves are licensed healthcare providers or not. See N.Y. Education Law § 6530; 8 N.Y.C.R.R. § 29.1.

103.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it engages in illegal fee-splitting, or if it pays or receives illegal kickbacks in exchange for patient referrals.

104.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

105.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to State Farm, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Counterclaim-Defendants' Fraudulent Scheme

106.    Upon information and belief, the publicity attendant to Pearl's professional discipline made it virtually impossible for him to obtain patient referrals from legitimate sources.

107.    Accordingly, although Pearl's medical license ultimately was reinstated in October 2008, Pearl faced considerable difficulty in developing a legitimate medical practice.

108.    As a result, Pearl decided to create a fraudulent practice, whereby the Counterclaim-Defendants would pay kickbacks to other healthcare providers in exchange for referrals of patients with no-fault insurance, purport to provide the Fraudulent Services to the insureds, submit or cause to be submitted large-scale billing for the Fraudulent Services to automobile insurers including State Farm that misrepresented HMP's eligibility to bill for or to collect No-Fault Benefits, and then unlawfully split the resulting proceeds with their billing company.

109.    Toward that end, Pearl incorporated HMP on December 1, 2008, shortly after his license to practice medicine was restored, and caused it to begin operations.

### A.    The Kickbacks

110.    HMP does not advertise or market its services to the general public, and does not provide services at any single, fixed location. Instead, HMP operates on a transient basis from a network of multidisciplinary clinics (the "Clinics") located throughout the metropolitan New

York area that purport to treat patients with no-fault insurance who claim to have been injured in automobile accidents. The Clinics include facilities located at the following addresses:

(i)      8518 4th Avenue, Brooklyn, New York;

(ii)     552 East 180th Street, Bronx, New York;

(iii)    333 East 56th Street, New York, New York;

(iv)    102-32 Jamaica Avenue, Richmond Hill, New York;

(v)     116-05 Jamaica Avenue, Richmond Hill, New York;

(vi)    705 East Tremont Avenue, Bronx, New York;

(vii)   40-11 Warren Street, Elmhurst, New York;

(viii)  34-07 White Plains Road, Bronx, New York;

(ix)    377 Remsen Avenue, Brooklyn, New York;

(x)     799 Morris Park Avenue, Bronx, New York; and

(xi)    37-63 86th Street, Jackson Heights, New York.

111.    Though ostensibly organized to provide a range of healthcare services to no-fault insureds at a single location, these Clinics in actuality are organized to supply convenient, one-stop shops for no-fault insurance fraud.

112.    The individuals who own and operate two of the Clinics from which the Counterclaim-Defendants have operated already have been indicted for their involvement in no-fault insurance fraud schemes at the Clinics including, upon information and belief, the fraudulent scheme that gives rise to the present Counterclaims.

113.    In particular, an entity called Gotham Medical, P.C. ("Gotham Medical") operated the Clinic located at 116-05 Jamaica Avenue, Richmond Hill, New York from which the Counterclaim-Defendants have operated, and an entity known as Remsen Health or Remsen

Medical ("Remsen Health") operated the Clinic located at 377 Remsen Avenue, Brooklyn, New York from which the Counterclaim-Defendants have operated.

114.    In November 2012, an indictment (the "November 2012 Indictment") in USA v. Katz, et al., Docket No. 1:12-cr-00884 (DLC)(the "Katz Action") was unsealed in the United States District Court for the Southern District of New York, charging Gotham Medical's putative owner, Alexandre Michel Scheer, M.D. ("Scheer"), as well as three unlicensed non-physicians, Ruvin Katz ("Katz"), Ben-Zion Kliot ("B. Kliot"), and Zahi Kliot ("Z. Kliot"), with conspiracy to commit healthcare fraud and mail fraud. A copy of the November 2012 Indictment is annexed hereto as Exhibit "4".

115.    Among other things, the November 2012 Indictment alleges facts indicating that:

(i)    though Scheer purported to own Gotham Medical, in actuality the professional corporation was operated by Katz, B. Kliot, and Z. Kliot;

(ii)    while purporting to be a legitimate medical care clinic specializing in the treatment of accident victims, Gotham Medical actually was a medical fraud mill that routinely billed automobile insurance companies for medical treatments that never were provided or that were medically useless;

(iii)    Katz, B. Kliot, and Z. Kliot paid individuals to recruit patients to seek treatment at Gotham Medical, and also paid the patients directly, coached the patients to falsify their medical conditions so as to substantiate continued treatment at Gotham Medical, and supervised the submission of fraudulent billing to insurance carriers; and

(iv)    Scheer worked at Gotham Medical, intentionally subjected patients to unnecessary treatment and diagnostic testing, and caused the submission of fraudulent bills to insurance companies.

See Exhibit "4".

116.    The November 2012 Indictment also charged the unlicensed non-physician who managed Remsen Health, Rafael Djafarov ("Djafarov"), with conspiracy to commit healthcare fraud and mail fraud. See Exhibit "4".

117.    Among other things, the November 2012 Indictment alleges facts indicating that:

(i)     while purporting to be a legitimate medical care clinic specializing in the treatment of accident victims, Remsen Health actually was a medical fraud mill that routinely billed automobile insurance companies for medical treatments that never were provided or that were medically useless; and

(ii)    Djafarov paid individuals to recruit patients to seek treatment at Remsen Health, who passed some of the money on to the patients, themselves, and Djafarov coached the patients to falsify their medical conditions so as to substantiate continued treatment at Remsen Health, and supervised the submission of fraudulent billing to insurance carriers.

See Exhibit "4".

118.    Between May and early July 2013, Katz, B. Kliot, Z. Kliot, and Djafarov pleaded guilty to the charges in the November 2012 Indictment.

119.    The Counterclaim-Defendants gain access to the Clinics by paying kickbacks to the Clinics and their owners in exchange for patient referrals. The kickbacks are disguised as ostensibly legitimate fees to "rent" space from the Clinics. In fact, these are "pay-to-play" arrangements that cause the Clinics to provide access to insureds and to refer the insureds to HMP.

120.    In exchange for these kickbacks from the Counterclaim-Defendants, the Clinics and their owners cause the other healthcare providers who operate from the Clinics to refer insureds to HMP regardless of the insureds' individual symptoms or presentation.

121.    In keeping with the fact that the Counterclaim-Defendants' ostensibly legitimate "rent" payments to the Clinics and their owners actually are kickbacks, the "rent" payments are far in excess of the actual value of any space that the Counterclaim-Defendants receive in exchange for the payments.

122.    For instance, during a February 17, 2012 examination under oath, Pearl gave testimony indicating that:

(i)     the Counterclaim-Defendants began to operate from the Clinics after office managers at the Clinics contacted the Counterclaim-Defendants' office manager and offered the Counterclaim-Defendants the opportunity to treat no-fault insureds at the Clinics, provided that the Counterclaim-Defendants paid "rent" to the Clinics;

(ii)    the putative "rent" arrangements are not memorialized in any written leases; and

(iii)   the Counterclaim-Defendants pay between $2,000.00 and $2,500.00 per month in "rent" to each of the Clinics, despite the fact that: (a) Pearl works from each of the Clinics for only a few hours per day once or twice per month, during which time he occupies a single room at each of the Clinics; and (b) the Clinics retain the use of the rooms when Pearl is not on-site.

123.    In keeping with the fact that the Counterclaim-Defendants purchase their referrals through kickbacks to the Clinics and their owners, the Counterclaim-Defendants have no relationship whatsoever with the other healthcare providers who operate from the Clinics and who purport to make the referrals to the Counterclaim-Defendants.

124.    For instance, during the February 17, 2012 examination under oath, Pearl gave testimony indicating that:

(i)     he did not receive written referrals from any of the healthcare providers who supposedly referred patients to the Counterclaim-Defendants at the Clinics;

(ii)    he could not identify any of the healthcare providers who supposedly referred patients to the Counterclaim-Defendants at the Clinics; and

(iii)   he did not send any of the Counterclaim-Defendants' treatment reports directly to the referring healthcare providers, but rather sent them to the Clinics.

125.    The unlawful kickback relationships that the Counterclaim-Defendants establish with the Clinics are essential to the success of the Counterclaim-Defendants' fraudulent scheme. The Counterclaim-Defendants derive significant financial benefit from the relationships because without the access to the insureds provided by the referring Clinics, the Counterclaim-Defendants would not have the ability to implement their fraudulent treatment and billing

protocol, bill automobile insurers including State Farm, or generate income from insurance claim payments.

**B.      The Fee-Splitting**

126.    Pursuant to New York law, arrangements whereby a management or billing company receives a fixed percentage of a healthcare provider's billing or receipts in exchange for performing billing services constitute illegal fee-splitting and render the healthcare provider ineligible to bill for or to collect No-Fault Benefits. See, e.g., N.Y. Education Law § 6530(19); 8 N.Y.C.R.R. § 29.1(b)(4); Necula v. Glass, 231 A.D.2d 457 (1st Dep't 1996); see also New York State Department of Health April 17, 1997 Opinion Letter, annexed hereto as Exhibit "5" ("any compensation arrangement that is based upon a percentage of physicians' gross revenues or profits, or net revenues or profits, of their practice or a discrete portion thereof, constitutes illegal fee-splitting … . The compensation of a person or company based upon a percentage of total fees billed and/or collected clearly constitutes such an illegal arrangement when the billing company is providing billing services for all or a portion of  a physician's practice.")

127.    At all relevant times, the Counterclaim-Defendants have engaged in an unlawful fee-splitting arrangement with their billing company that has rendered them ineligible to bill for or to collect No-Fault benefits in connection with the Fraudulent Services.

128.    For instance, during the February 17, 2012 examination under oath, Pearl gave testimony indicating that:

(i)      the Counterclaim-Defendants pay their billing company a percentage of the amounts that it bills and collects on behalf of HMP;

(ii)     Pearl could not recall the exact percentage that the billing company is paid on the amounts that it bills or collects on behalf of HMP; and

(iii)    Pearl could not recall the name of the billing company or any contact person at the billing company.

C.    **The Fraudulent Billing the Counterclaim-Defendants Submitted to State Farm**

129.    To support their fraudulent charges for the Fraudulent Services, the Counterclaim-Defendants submitted or caused to be submitted dozens of HCFA-1500 forms and treatment reports through HMP to State Farm seeking payment for the Fraudulent Services for which the Counterclaim-Defendants were not entitled to receive payment.

130.    The HCFA-1500 forms and treatment reports submitted to State Farm by and on behalf of the Counterclaim-Defendants are false and misleading in that they uniformly misrepresented to State Farm that the Counterclaim-Defendants were in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Counterclaim-Defendants were not in compliance with all material licensing laws in that they paid illegal kickbacks to the Clinics and their owners in exchange for patient referrals and engaged in unlawful fee-splitting with their billing company.

III.    **The Counterclaim-Defendants' Fraudulent Concealment and State Farm's Justifiable Reliance**

131.    The Counterclaim-Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to State Farm.

132.    To induce State Farm to promptly pay the fraudulent charges for the Fraudulent Services, the Counterclaim-Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

133.    Specifically, they knowingly misrepresented and concealed facts relating to their illegal referral arrangements with the Clinics and their illegal fee-splitting with their billing

company in an effort to prevent discovery that the Counterclaim-Defendants failed to comply with material licensing requirements in that they unlawfully split fees with unlicensed persons and illegally paid kickbacks for patient referrals.

134.    Additionally, the Counterclaim-Defendants entered into complex financial arrangements with the Clinics, their owners, and their billing company that were designed to, and did, conceal that fact that the Counterclaim-Defendants failed to comply with  material licensing requirements in that they unlawfully split fees with unlicensed persons and unlawfully paid kickbacks for patient referrals.

135.    The Counterclaim-Defendants hired law firms to pursue collection of the fraudulent charges from State Farm and other insurers. These law firms routinely filed expensive and time-consuming litigation against State Farm and other insurers if the charges were not promptly paid in full.

136.    State Farm is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause State Farm to rely upon them. As a result, State Farm incurred damages of more than $104,000.00 based upon the fraudulent charges.

137.    Based upon the Counterclaim-Defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and could not reasonably have discovered that its damages were attributable to fraud until February 2012.

**FIRST CAUSE OF ACTION**
**Against the Counterclaim-Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

138.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 81 through 137 above.

139.    There is an actual case in controversy between State Farm and the Counterclaim-Defendants regarding more than $179,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to State Farm.

140.    The Counterclaim-Defendants have no right to receive payment for any pending bills submitted to State Farm because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Counterclaim-Defendants and others.

141.    The Counterclaim-Defendants have no right to receive payment for any pending bills submitted to State Farm because the Counterclaim-Defendants unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

142.    Accordingly, State Farm requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Counterclaim-Defendants have no right to receive payment for any pending bills submitted to State Farm because:

(i)      the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Counterclaim-Defendants and others, rendering the Counterclaim-Defendants ineligible to bill for or to collect No-Fault Benefits; and

(ii)     the Counterclaim-Defendants unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

## SECOND CAUSE OF ACTION
### Against the Counterclaim-Defendants
### (Common Law Fraud)

143.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 81 through 142 above.

144.    The Counterclaim-Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm and concealed material facts from State Farm in the course of their submission of dozens of fraudulent bills seeking payment for the Fraudulent Services.

145.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     in every claim, the representation that the Counterclaim-Defendants were properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Counterclaim-Defendants were not properly licensed in that they paid illegal kickbacks in exchange for their patient referrals; and

(ii)    in every claim, the representation that the Counterclaim-Defendants were properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Counterclaim-Defendants were not properly licensed in that they unlawfully split fees with unlicensed individuals and entities.

146.    The Counterclaim-Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce State Farm to pay charges submitted through HMP that were not compensable under the No-Fault Laws.

147.    State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid at least $104,000.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Counterclaim-Defendants through HMP.

148.    The Counterclaim-Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles State Farm to recover punitive damages.

149.    Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Counterclaim-Defendants**
**(Unjust Enrichment)**

150.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 81 through 149 above.

151.    As set forth above, the Counterclaim-Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of State Farm.

152.    When State Farm paid the bills and charges submitted by or on behalf of the Counterclaim-Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Counterclaim-Defendants' improper, unlawful, and/or unjust acts.

153.    The Counterclaim-Defendants have been enriched at State Farm's expense by State Farm's payments, which constituted a benefit that the Counterclaim-Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

154.    The Counterclaim-Defendants' retention of State Farm's payments violates fundamental principles of justice, equity and good conscience.

155.    By reason of the above, the Counterclaim-Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $104,000.00.

## JURY DEMAND

156.    Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury.

**WHEREFORE**, Counterclaim-Plaintiff State Farm Mutual Automobile Insurance Company demands that a Judgment be entered in its favor:

A.    on the First Cause of Action against the Counterclaim-Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Counterclaim-Defendants have no right to receive payment for any pending bills submitted to State Farm;

B.    on the Second Cause of Action against the Counterclaim-Defendants, compensatory damages in favor of State Farm an amount to be determined at trial but in excess of $104,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

C.    on the Second Cause of Action against the Counterclaim-Defendants, more than $104,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: August 8, 2013

RIVKIN RADLER LLP

By:_____/s/_____
        Evan Krinick (EK 4271)
        Barry I. Levy (BL 2190)
926 RXR Plaza
Uniondale, New York  11556
(516) 357-3000
*Counsel for Defendant and Counterclaim-*
*Plaintiff State Farm Mutual Automobile*
*Insurance Company*